UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

BUNTIN McPHERSON,

                Plaintiff,

  -against-

NYP HOLDINGS, INC., d/b/a NEW YORK POST,

                Defendant.
-------------------------------------------------------------------X

**MEMORANDUM AND ORDER**
03-CV-4517 (NGG)(LB)

**NOT FOR PUBLICATION**

GARAUFIS, District Judge.

    Plaintiff Buntin McPherson ("McPherson") brings this action against his former employer, defendant NYP Holdings, Inc., d/b/a New York Post (the "Post"), alleging that the Post engaged in unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), 42 U.S.C. § 1981, New York Executive Law § 290 et seq., and New York City Administrative Code § 8-107. McPherson asserts claims for pay discrimination and harassment, in the form of a hostile work environment, on the basis of his race and national origin. Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the Post moves for summary judgment on all of McPherson's claims. For the reasons set forth below, the Post's motion is GRANTED.

**I.    BACKGROUND**

    McPherson, a Jamaican-born, African-American male, began working for the Post in 1993. (Def. Statement of Facts ¶ 1.)[1] Before he joined the Post, the Plaintiff had worked as a

---

[1] Under Local Rule 56.1(c), all material facts set forth by the moving party in its statement of material facts that are not controverted by the opposing party in its own statement of material facts are deemed admitted.

welder and as a stock clerk, earning a maximum of $500 per week, or approximately $26,000 per year. (Def. Statement of Facts ¶ 11.) McPherson had never worked in the newspaper industry prior to working at the Post. (Def. Statement of Facts ¶ 3.)

When the Post initially hired McPherson in 1993, he worked as an employee in the Return Room. (Id. ¶ 1.) In January 1998, the Plaintiff was promoted to Return Room Manager, at which point his salary increased from $25,817 to $30,000 per year. (Id. ¶ 19.) In January 1999, McPherson's salary increased to $31,500 and in February 1999, his salary increased to $45,000 per year.[2] (Id.) In addition to bonuses ranging from $1,500 to $2,000, the Plaintiff received yearly pay increases of approximately $1,500. (Id.) At the time of his termination in April 2002, the Plaintiff's salary had reached $49,400. (Id.)

As Return Room Manager, McPherson oversaw the Return Room clerks, maintained records concerning newspaper vendor sales, and generated discrepancy reports which tracked the number of newspapers that vendors returned to the Post and the number of newspapers that vendors claimed that they had sold. (Pl. Aff. ¶ 7.) In addition, McPherson would occasionally distribute Post paraphernalia to newspaper vendors and travel to various vendor locations to investigate their sales of Sunday newspapers. (Id. ¶ 8.) Several times a year, McPherson would deliver Post articles to a TV Guide facility in New Jersey. (Id.)

Starting in 1999, Ernest Rota became McPherson's direct supervisor. (Id. ¶ 14.) According to McPherson, Rota made a number of racial comments to him. (Id. ¶¶ 16-18.) McPherson alleges that Rota entered McPherson's office sometime in 1999 and yelled at

---

[2] The Post increased Plaintiff's salary by 42% to $45,000 after the Plaintiff indicated he was dissatisfied with his current salary because he earned more working overtime as a clerk in the Return Room. (Gilkey Aff. ¶ 13.)

2

McPherson, "Black fuck, what's going on?" (Id. ¶ 16.) Although upset by Rota's comment, McPherson did not tell Rota that he was upset, nor did he report this comment to Rota's superiors or to the Post's Human Resources Department. (Id.) According to McPherson, he was afraid he would be fired if he made such a complaint. (Id.) McPherson claims that Rota, on another occasion, told McPherson, "You fucking Black people always give trouble." (Id. at 17.) McPherson did not report this statement either. (Id.) Rota's final comment occurred in April 2002 when Rota slammed McPherson's office door and allegedly said, "It's time to get rid of this f–cking Black Jamaican." (Id. ¶ 18.) Immediately after making this statement, McPherson alleges that Rota told him to teach his job to one of the part-time clerks. (Id.)

On April 11, 2002, McPherson was notified that he was suspended, and on May 10, 2002, McPherson's employment at the Post was terminated. (Id. ¶¶ 20-21.) The Post asserts that McPherson was fired due to an investigation conducted at the Post that revealed that McPherson had maintained the name of a former employee on the payroll, had submitted several time sheets under the former employee's name, and had cashed this employee's paychecks for himself. (Gilkey Aff. ¶¶ 17-19.)

After McPherson's employment at the Post ended, the Post hired Joseph LaVacca as Return Room Manager, the same title that McPherson held before he was fired. (Def. Statement of Facts ¶ 27.) LaVacca is White and not of Jamaican origin. (Id. ¶ 28.) LaVacca's starting salary at the Post was $62,500, over $13,000 higher than McPherson's final salary at the Post. (Gilkey Aff. ¶ 28.) Prior to his employment at the Post, LaVacca earned $80,000 per year as an assistant controller at Parish Trinity Church, where he analyzed financial statements and performed budgeting tasks. (Def. Statement of Facts ¶ 27; Def. Ex. G.) Joseph Gilkey, Vice

3

President of Circulation at the Post,[3] asserts that LaVacca's higher salary was in part based on the understanding that LaVacca would utilize his analytic and computer skills to compile and analyze return room data with a higher level of sophistication than McPherson. (Gilkey Aff. ¶¶ 20-43.) Gerald Shore, who is White and not of Jamaican origin, became the Return Room Manager after LaVacca resigned in November 2002. (Def. Statement of Facts ¶ 44.) Shore's starting salary as Return Room Manager was $50,000. (Id.)

James Collins, Paul Clauss, and Larry Strickland, all of whom are White and not of Jamaican origin, were managers in the Circulation Department during the period of time when the Plaintiff was the Return Room Manager. (Id. ¶ 46.) Each earned more than the Plaintiff. (Ofodile Aff. Ex. 8.) Collins, Clauss and Strickland had from twenty to forty years experience in the newspaper and magazine industry, although the Plaintiff disputes the extent to which this experience is applicable to their current positions. (Id. ¶ 50; Pl. Statement of Facts ¶ 50.) The Plaintiff, Collins, Clauss, and Strickland each held managerial positions, but their responsibilities differed. (Def. Statement of Facts ¶ 47.)

On or about August 19, 2002, McPherson filed a complaint with the New York State Division of Human Rights charging the Post with unlawful discrimination practices. (Strauss Aff. Ex. B.) The Division of Human Rights determined on April 10, 2003 that there was no probable cause to believe that the Post engaged in the unlawful practices alleged by McPherson. (Id.) Thereafter, McPherson filed a complaint and, on May 10, 2004, an amended complaint in this court alleging violations of Title VII, 42 U.S.C. § 1981, and the Human Rights Law of New

---

[3] At the time of the Plaintiff's employment with the Post, Gilkey was the Director of Circulation and John Amann was the Vice President of Circulation. In October 2002, after the Plaintiff was terminated, Gilkey replaced Amann as Vice President of Circulation. (Gilkey Aff. ¶ 2.)

York City and State. McPherson originally claimed that he was unlawfully terminated from his employment on account of his race and national origin but subsequently withdrew this claim. (Pl. Am. Compl. ¶¶ 25-30; Strauss Aff. Ex. A.) McPherson's remaining federal claims are brought pursuant to 42 U.S.C. § 1981.[4] (Strauss Aff. Ex. A.)

## II. STANDARD OF REVIEW FOR A MOTION FOR SUMMARY JUDGMENT

A motion for summary judgment should be granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the burden of establishing the absence of a genuine issue of material fact. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). Once the moving party has met this burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). When deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party and must draw all permissible inferences from the submitted affidavits, exhibits, interrogatory answers, and depositions in favor of that party. See Anderson, 477 U.S. at 255.

A trial court must be especially cautious in deciding whether to grant summary judgment

---

[4] In their analyses of the Plaintiff's § 1981 claims, the parties appropriately rely upon Title VII case law. See Gadsden v. Jones Lang Lasalle Ams., Inc., 210 F.Supp.2d 430, 442 (S.D.N.Y. 2002) ("In a disparate treatment case the standard for liability under Title VII . . . is the same as that applicable under § 1981...."); Harvey v. NYRAC, Inc., 813 F. Supp. 206, 209 (E.D.N.Y. 1993) ("It is well settled that the respective burdens of proof and persuasion of the parties in a Title VII action...apply equally to a § 1981 action.") (citing Patterson v. McLean Credit Union, 491 U.S. 164 (1989)). In addition, McPherson's city and state law claims under New York City Administrative Code § 8 et seq. and New York State Executive Law, Article 15, Section 296 parallel the analysis used in Title VII claims. Cruz v. Coach Stores, Inc., 202 F.3d 560, 565 (2d Cir. 2000).

5

in a discrimination case "because the employer's intent is often at issue and careful scrutiny may reveal circumstantial evidence supporting an inference of discrimination." Belfi v. Prendergast, 191 F.3d 129, 135 (2d Cir. 1999). However, "[t]he nonmovant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118,121 (2d Cir. 1990) (internal quotations and citations omitted). Rather, the opponent can only create a genuine issue of material fact by citing competent, admissible evidence. Glasso v. Eisman, Zucker, Klein & Ruttenberg, 310 F.Supp.2d 569, 574 (S.D.N.Y. 2004) (citing Sarno v. Douglas Elliman-Gibbons & Ives, 183 F.3d 155, 160 (2d Cir. 1999)).

### III. PLAINTIFF'S DISPARATE PAY CLAIM

McPherson, whose final salary at the Post was $49,400, claims that he was subject to disparate pay in comparison with his White, American-born co-workers. To support his claim, McPherson points to the salaries of: 1) Joseph LaVacca, who was hired to replace McPherson as Return Room Manager and received a starting salary of $62,500; 2) Gerald N. Shore, who replaced LaVacca as Return Room Manager and received a starting salary of $50,000; and 3) Paul Clauss, Larry Stickland, and James Collins, other Circulation Department managers that received higher salaries and larger bonuses than the Plaintiff.

In order to make out a *prima facie* disparate pay claim, a plaintiff must show (1) that he was a member of a protected class; (2) that he was paid less than similarly situated non-members of his protected class; and (3) evidence of discriminatory animus. See Belfi, 191 F.3d at 139. The parties do not dispute that the Plaintiff is a member of a protected class. The Post argues that McPherson improperly compares himself to other Post employees to whom he is not

similarly situated and that the Plaintiff has not provided evidence that the Post acted with discriminatory animus. Each of the Post's arguments is considered in turn.

### A. Similarly Situated

In order to assert a disparate pay claim under Title VII or § 1981, similarly situated employees must be similarly situated in "all material respects." McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir. 2001). Their circumstances need not be identical, but the employees must share a sufficient amount of significant employment characteristics to be considered similarly situated. DeJesus v. Starr Tech. Risks Agency, Inc., 03 Civ. 1298, 2004 WL 2181403, at *9 (S.D.N.Y. Sept. 27, 2004). These characteristics include the employees' education, work experience, and specific work duties. Id.; Quareless v. Bronx-Lebanon Hosp. Center, 228 F.Supp.2d 377, 383 (S.D.N.Y. 2002) (noting plaintiff does not account "for differences in education, seniority, performance, or specific work duties"). With respect to work duties, "the performance of some common tasks does not make jobs substantially equal when material differences also exist." Conigliaro v. Horace Mann Sch., No. 95 Civ. 3555, 2000 WL 45439, at *8 (S.D.N.Y. Jan. 19, 2000); see also Bandhan v. Laboratory Corp. of Am., 234 F.Supp.2d 313, 317-18 (S.D.N.Y. 2002) (finding greater work experience and specific work duties may justify pay discrepancies).

#### 1. Joseph LaVacca

LaVacca became Return Room Manager in 2002, after the Plaintiff's employment was terminated. (Statement of Facts ¶ 27.) Prior to his employment with the Post, LaVacca had worked as an assistant controller, as a controller, and as an accounting manager. (Strauss Aff. Ex. G.) As an assistant controller, he performed "all aspects related to billing and collection"

7

and "implemented a new computer system." (Id.) As an accounting manager, he performed "day to day accounting, billing, and budgeting." (Id.) As a controller, LaVacca had responsibility over tax filings, billing, and the daily operations of the finance department. (Id.) In his final position before joining the Post, LaVacca performed all "financial statement analysis, budgeting, and day to day operation of finance." In his last four jobs prior to working at the Post, LaVacca earned annual salaries of $45,000, $50,000, $65,000, and $80,000 respectively. (Strauss Aff. Ex. G.; Def. Statement of Facts ¶ 35.) In salary negations, LaVacca informed the Post that he would not accept the Post's offer of employment unless he was paid at least $62,500 per year. (Gilkey Aff. ¶ 28.)

In hiring LaVacca, the Post envisioned that LaVacca would bring an added level of sophistication to the analysis of returns in order to increase the Post's profitability. (Gilkey Aff. ¶¶ 23-25, 31.) It is undisputed that LaVacca performed computer-based functions in his role as Return Room Manager that the Plaintiff did not perform. (Rota Dep. at 49-53.) By providing reports on a computer-generated spread sheet, LaVacca was able to compile information in a format that was conducive to the analysis of return data. (Id.) Although the Plaintiff does not appear to have been asked to generate the types of reports that LaVacca produced (Rota Dep. at 51), there is nothing in the Plaintiff's employment history to indicate that the Plaintiff was capable of performing such a task. (Strauss Aff. Ex. F.) Rather, the Plaintiff's past work experience was limited to various blue-collar positions, including welder and stock clerk, for which he earned no more than $500 per week. (Strauss Aff. Ex. F.)

Although both the Plaintiff and LaVacca held the title of "Return Room Manager,"

8

LaVacca was hired to perform additional, highly skilled tasks in this capacity.[5] In addition, LaVacca had significant accounting and billing experience, a considerably higher salary history, a demand for a higher salary, and computer skills that the Plaintiff lacked. In light of these significant differences, the Plaintiff and LaVacca are not "similarly situated" individuals for the purposes of the Plaintiff's disparate pay claim. See Marshall v. Aetna Ins. Co., 487 F.Supp. 717, 724 (E.D. Va. 1979) (finding no violation where "the difference between [the plaintiff's] salary and [male employee's] starting salary was not determined on the basis of sex but was based upon [the defendant company's] reasonable expectation that [the plaintiff's] ability and more substantial prior underwriting and managerial experience would allow him to take on greater responsibility and would make him a more valuable employee.").[6]

### 2. Other Managers in the Circulation Department

The Plaintiff further contends he received disparate pay when compared with three white managers at the Post: James Collins, Paul Clauss, and Larry Strickland. James Collins began working at the Post in 1961. (Gilkey Aff. ¶ 45.) At the time the Plaintiff was Return Room Manager, Collins held the position of Suburban and Country Manager, overseeing the circulation

---

[5] The Plaintiff's assertion that the Post has produced no evidence that LaVacca was hired to perform additional tasks as Return Room Manager ignores Gilkey's uncontroverted testimony. Indeed, Gilkey's testimony is further supported by the fact that Gerald Shore, LaVacca's successor, was not hired to perform analytical tasks and his salary was on par with that of the Plaintiff. (See Gilkey Aff. ¶ 42.)

[6] While Marshall involves a pay discrimination claim under the Equal Pay Act, "[a] claim of unequal pay for equal work under Title VII ... is generally analyzed under the same standards used in an EPA claim. However, unlike an EPA plaintiff, a Title VII plaintiff must also produce evidence of discriminatory animus in order to make out a prima facie case of intentional sex-based salary discrimination." Tomka, 66 F.3d at 1312-13 (2d Cir. 1995) (citations omitted). The standard used to determine the existence of pay discrimination is therefore applicable to the present case with the exception of the issue of discriminatory animus.

9

of all newspapers outside the fifty-mile radius surrounding New York City. (Id.) Paul Clauss held the position of Suburban Sales Manager and was responsible for the circulation of the newspaper outside New York City's boroughs and in "remote" sites such as Florida and California. (Id. ¶ 48.) Later, as Circulation Sales Manager, he supervised newspaper hawkers and vending machines throughout the city. (Id.) Clauss had nearly forty years of experience in the newspaper and magazine industry before he began working for the Post in 1999. (Id.) Larry Strickland held the position of Home Delivery Manager and oversaw the service, billing, and collections for all home deliveries of the Post. (Id. ¶ 50.) In addition, as part of his customer service responsibilities, he would discuss delivery problems directly with Post customers. (Id.) Before his work at the Post, Strickland had nearly twenty years of experience in the newspaper industry. (Id. ¶ 49.)

Collins, Clauss, and Strickland each had significantly more years of experience in the newspaper industry than the Plaintiff, who had been working at the Post for less than ten years. In addition, these managers each had specific work duties which were considerably different from McPherson's. While McPherson was responsible for accounting for the papers that were returned, Collins, Clauss, and Strickland dealt directly with the Post's vendors and customers, and their performance had a direct impact on the Post's ability to increase its circulation. (Gilkey Aff. ¶ 51.) Moreover, although the Plaintiff claims that they were all entitled to equivalent pay as managers in the Circulation Department, the Plaintiff admits that Clauss, Collins, and Strickland were in the same "category" as the Plaintiff's immediate supervisor, Ernest Rota. (McPherson Dep. at 189-90.) The Return Room Manager's lesser status within the managerial hierarchy of the Circulation Department is further indicated by his office location. While the

10

Plaintiff worked within the Return Room, Clauss, Collins, and Strickland's offices were located close to Rota and Gilkey. (Gilkey Aff. ¶ 53.) When the Post moved to its Bronx facility, they had their offices on the second floor suite area, while McPherson's office was on the ground floor production area. (Id.) Because these managers had far more work experience, significantly different responsibilities, and were employed in higher level management positions than the Plaintiff, they cannot be considered "similarly situated" to McPherson for the purposes of a disparate pay claim. Accordingly, McPherson's disparate pay claims with respect to these three individuals are dismissed.

The Plaintiff also asserts that he was subject to disparate pay because, unlike Collins and Strickland, he was not reimbursed for travel related expenses. First, McPherson was not similarly situated to these employees because, unlike Collins and Strickland, he traveled only on rare occasions. By contrast, Strickland was "out in the field a lot" (Strickland Dep. at 30) and Collins "needed a car" for his job (Collins Dep. at 22). Second, an employee must submit a voucher and receipts to be reimbursed for travel expenses. (Collins Dep. at 23-25; Strickland Dep. at 31-33.) McPherson has not provided any evidence that he submitted vouchers or receipts for reimbursement, nor has he even alleged that he submitted any reimbursement voucher to the Post. Accordingly, absent any evidence to support his assertions, the Plaintiff's reimbursement claim is dismissed.

### 3. Gerald Shore

Although he mentions Gerald Shore only briefly, McPherson appears to contend that he and Shore were similarly situated and that their difference in salary was sufficient to state a claim of pay discrimination. (Pl. Opp'n. at 16.) Gerald Shore, who is White and American-born,

11

replaced LaVacca as Return Room Manager in late 2002 and earned a salary of $50,000, $600 more than the Plaintiff earned prior to his termination from the Post. Facts in the record concerning Shore's background are sparse, with the exception of evidence that Shore had computer skills that the Plaintiff lacked. (Gilkey Aff. ¶ 42.) However, it appears the responsibilities of Shore and McPherson were largely the same, as many of LaVacca's analytical tasks were assigned to a new employee working as a circulation analyst.[7] (Id.) Viewed in the light most favorable to the Plaintiff, the fact that the Plaintiff and Shore's responsibilities as Return Room Manager were largely the same and that there is little evidence of disparate differences in their employment histories and work skills, McPherson and Shore share a sufficient amount of significant employment characteristics to be considered similarly situated. However, as set forth below, the Plaintiff's claim fails because he provided no evidence that any pay difference between the Plaintiff and Shore, or for that matter, any other employee at the Post, was the result of intentional discrimination.[8]

---

[7] Gilkey stated that Shore's salary was significantly less than LaVacca's because Gilkey assigned many of the analytical takes that LaVacca had been performing to the circulation analyst. (Gilkey Aff. ¶ 42.) It is unclear from the record the extent to which Shore's computer skills may have enhanced his performance as Return Room Manager given the change in that position's responsibilities following LaVacca's departure.

[8] In addition, although not discussed by either party, the Plaintiff's claim is premised on the *de minimis* salary increase of a non-immediate successor. Certainly, small differences in pay may suffice to create a valid claim of disparate pay when the employees are employed at the same time. See Hernandez v. Kellwood Co., 99 Civ. 10015, 2003 WL 22309326, at *9 (S.D.N.Y. Oct. 8, 2003) (claim arising under Equal Pay Act). Additionally, large increases in the salary of a successor cannot be explained away by inflationary forces. See Dubowsky v. Stern, Lavinthal, Norgaard & Daly, 922 F. Supp. 985, 991 (D.N.J. 1996) (inflationary forces could not account for a 20% increase in the pay of successor). Here, by contrast, Shore's starting salary was only $600 more than McPherson's – approximately a 1% difference in salary. It was the Post's practice to award an average raise of approximately three percent of the previous year's salary for each manager in the Circulation Department. (Id. ¶ 11.) Consistent with this practice, once the

B.   **Discriminatory Animus**

The Plaintiff has also not produced evidence of discriminatory animus to make out a *prima facie* case of intentional discrimination. Belfi v. Prendergast, 191 F.3d 129, 140 (2d Cir. 1999); Tomka v. Seiler Corp., 66 F.3d 1295, 1313 (2d Cir. 1995) *abrogated on other grounds by* Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998). It is undisputed that Gilkey and Amann[9] determined McPherson's pay, and that McPherson has provided no evidence that Gilkey or Amann harbored racial animus. Instead, McPherson alleges that his direct supervisor, Rota, possessed such animus because Rota made three racial remarks over a period of three years. McPherson argues that Gilkey and Amann were used as a conduit for Rota's animus. McPherson's argument rests upon the fact that Rota talked with Gilkey and Amann about McPherson's job performance and that it was "very likely" that Rota, as McPherson's direct supervisor, played a role in determining McPherson's pay. (Pl. Resp. to Def.'s Statement of Fact ¶ 18.)

Where there is no evidence that a decision-maker harbored discriminatory animus, a plaintiff must provide evidence that the decision-maker acted as a conduit for another who did harbor such animus. See Dawson v. Bumble & Bumble, 398 F.3d 211, 224-25 (2d Cir. 2005). A decision-maker may be considered a conduit for discriminatory animus where the bias of another

---

Plaintiff became Return Room Manager, his yearly salary increase was above three percent every year except for 2002, when it was increased by 2.9%. (Strauss Ex. E.) Shore's salary as Return Room Manager is consistent with the pace of these yearly increases. (See Ofodile Aff. Ex. 8). Thus, this court is unconvinced that there is actually a pay disparity between Shore and the Plaintiff to state a claim of pay discrimination.

[9] John Amann was Vice President of Circulation at the time of the Plaintiff's employment. (Gilkey Aff. ¶ 2.)

plays a substantial role in the ultimate determination of the decision-maker. Rose v. New York City Bd. of Educ., 257 F.3d 156, 162 (2d Cir. 2001) (discriminatory comments of plaintiff's supervisor, who did not have formal firing authority but who "had enormous influence in the decision-making process," constituted evidence of discrimination); Weber v. Parfums Givenchy, Inc., 49 F. Supp. 2d 343, 361 (S.D.N.Y. 1999) ("Although Frier may not have been the person who made the ultimate decision to fire Weber, a jury could infer from the evidence that Frier [who had allegedly made discriminatory comments about Weber] had substantial input in the decision-making process").

Even having been afforded the benefits of a full discovery, McPherson has provided no evidence that Rota played a substantial role in the Gilkey and Amman's determinations concerning McPherson's pay. Specifically, he has provided no evidence that Rota was consulted or made recommendations in relation to McPherson's pay determinations. See McLee v. Chrysler Corp., 109 F.3d 130, 137 (2d Cir. 1997). He has provided no evidence that Rota made discriminatory comments to Gilkey or Amann. See Sanni v. New York State Office of Mental Health, 96-CV-5720, 2000 WL 194681, at *7 (E.D.N.Y. Feb. 15, 2000) (finding that such a discriminatory comment "barely" established an inference of discrimination). He has provided no evidence that the decision-makers relied entirely upon Rota's evaluations of McPherson.[10] Fullard v. City of New York, 274 F.Supp.2d 347, 357 (S.D.N.Y. 2003). And he has provided no evidence that Rota held "enormous" influence over the decision-makers. Rose, 257 F.3d at 162. While McPherson speculates that Rota had a role in the determination of the Plaintiff's salary, even viewed in the light most favorable to the Plaintiff, nothing in the record suggests that Rota

---

[10] Indeed, Gilkey directly observed McPherson's performance at times. (See Gilkey Aff. ¶ 24.)

14

was involved in salary determinations. The Post, however, has provided sworn testimony stating that Rota was not involved or consulted in decisions regarding McPherson's pay. (Gilkey Aff. ¶ 9; Rota Aff. ¶ 3.) Because McPherson has failed to provide any evidence that Gilkey or Amann possessed discriminatory animus, and has failed to provide evidence that Rota played a substantial role in their decisions regarding McPherson's pay, his pay discrimination claim must also be dismissed for failure to provide evidence of discriminatory animus.

## IV. Hostile Work Environment

"To prevail on a hostile work environment claim, a plaintiff must demonstrate: (1) that [his] workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997). In determining whether a workplace is permeated with such severe or pervasive discrimination, the court considers "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., 510 U.S. 17, 23 (1993); see also Brennan v. Metropolitan Opera Ass'n, 192 F.3d 310, 391 (2d Cir. 1999). The Second Circuit has explained that "[f]or racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." Schwapp, 118 F.3d at 110 (twelve racial comments within a twenty month period may have constituted a hostile work environment).

15

McPherson alleges that he was subjected to a hostile work environment because of the comments that his supervisor allegedly made towards him. Three comments made over a period of more than two years amount only to a few isolated incidents, and therefore do not constitute a hostile work environment. See Pagan v. N.Y. State Div. of Parole, 98 Civ. 5840, 2003 WL 22723013, at *6 (S.D.N.Y. Nov. 18, 2003) (four racial remarks within one year did not create a hostile work environment); Dorrilus v. St. Rose's Home, 234 F.Supp.2d 326, 335 (S.D.N.Y. 2002) (employee calling plaintiff "El Negro" four times within one month did not create a hostile work environment); Stembridge v. City of New York, 88 F.Supp.2d 276, 286 (S.D.N.Y. 2000) (seven racial comments over three years did not create a hostile work environment even when plaintiff's supervisor called him an "uppity nigger" and "boy"). Furthermore, in his hostile work environment claim, McPherson has alleged no instance of physical abuse or public humiliation, factors which might have created a hostile work environment in spite of the relative paucity of alleged racial comments. See Richardson v. New York State Dep't of Correctional Serv., 180 F.3d 426, 433-34 (2d Cir. 1999) (finding a work environment may be hostile when certain racial comments were made in front of plaintiff's co-workers although there were only ten discriminatory events within a four-year period ). Because the alleged racial remarks were sporadic, and McPherson did not allege physical abuse or public humiliation, McPherson's hostile work environment claims are dismissed.

Even if McPherson had stated a valid hostile work environment claim, the Post would still not be held liable because it has established a valid affirmative defense. An employer may establish such a defense when (1) the employer exercises reasonable care to prevent and correct promptly any harassing behavior; and (2) the employee fails to take advantage of any preventive

16

or corrective opportunities provided by the employer and does not provide any reasonable evidence for his failure to do so. See Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998); see also Leopold v. Baccarat, Inc., 239 F.3d 243, 245 (2d Cir. 2001) ("Although not necessarily dispositive, the existence of an anti-harassment policy with complaint procedures is an important consideration in determining whether the employer has satisfied the first prong of this defense.")

Here, the Post's practice was to distribute the Post's Standards of Business Conduct to all of its employees. (Babajko ¶¶ 4-6.) In the Standards of Business Conduct, there is a section which explains:

> It is the Company's policy to investigate thoroughly and remedy any incidents of harassment....An employee who feels he or she has been harassed should immediately notify the Head of the Human Resources Department, or any member of management with whom he or she feels comfortable discussing the situation. All complaints will be treated as confidentially as possible and all investigations will be conducted expeditiously. There will be no retaliation against a person who, in good faith, files a complaint or participates in any way in the investigation of a complaint.

(Strauss Aff. Ex. H.) Such a complaint procedure is sufficient to satisfy the first prong of the defendant's affirmative defense. See Leopold, 239 F.3d at 245 (an employer's complaint procedure satisfied the first prong although the policy failed to guarantee confidentiality and non-retaliation). The second prong is satisfied because McPherson did not take advantage of the Post's complaint procedure and did not provide sufficient evidence as to why failed to do so. See id. Therefore, even if McPherson had established that there was a hostile work environment, his claim would nevertheless be dismissed.

## V. CONCLUSION

For the foregoing reasons, the Post's motion for summary judgment is GRANTED. The

Plaintiff's Section 1981 claims are dismissed. In addition, because the Plaintiff's state and local claims are analyzed in the same manner as his Section 1981 claims and derive from a common nucleus of operative fact, the Plaintiff's claims brought under New York City Administrative Code § 8 and New York State Executive Law, Article 15, Section 296 are also dismissed. <u>See</u> <u>People by Abrams v. Terry</u>, 45 F.3d 17, 23 n.7 (2d Cir. 1995) (citations omitted). The Clerk of Court is directed to close this case.

SO ORDERED.

Dated: September 1, 2005            /s/ Nicholas G. Garaufis
       Brooklyn, N.Y.               Nicholas G. Garaufis
                                                United States District Judge